# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

SANTOS SANCHEZ,

        Plaintiff,

v.                                           Case No. 24-CV-0306

CITY OF MILWAUKEE, MOISES GOMEZ,
GEORGE IRIZARRY, STEVEN SPINGOLA,
KENNETH GRAMS, and JOHN VITRANO,

        Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Defendants, by and through their attorneys, Evan C. Goyke, City Attorney, represented by Matteo Reginato, Assistant City Attorney and Meghan McCabe, Assistant City Attorney, respectfully submit the following Brief in Support of their Motion for Summary Judgment.

## FACTS

In the early morning of April 18, 1996, Christina DePena called 911 from a payphone, reported that several men attempted to rob her at/near her apartment, and reported that someone was shot or stabbed. (PFOF 8-9.) Milwaukee Police Department (MPD) officers spoke with DePena shortly thereafter who indicated that she was returning to her apartment with her children (Merced, Kenia, and Ana) when she noticed a man being chased by two other men, that when she opened her apartment door, two men entered the apartment, and that she then entered with her children, went into a bedroom, and heard a gunshot. (PFOF 10-11.)

MPD officers interviewed Merced and Kenia later that day. (PFOF 12, 14.) During their interviews, Merced and Kenia *initially* reported that they were outside the apartment and observed an unknown man yelling and being chased by two other men, that when DePena opened the door,

two men ran inside and ordered them to sit on the couch and cover their eyes, and that they then heard a gunshot.  (PFOF 13, 15.)  Notably, Kenia admitted this was untrue during her interview and explained that DePena instructed her and her sisters to report the false narrative.  (PFOF 16.) Kenia then reported that she was asleep in her room when DePena woke her up and stated they needed to leave the apartment, and that when she left, she observed Santiago on the sofa with blood all over his neck/chest and a gun on the floor.  (PFOF 17.)

MPD officers also interviewed Ana on April 18, who reported that she was asleep when her sister woke her up and rushed her out of the apartment, and that while she was leaving, she observed Santiago on the sofa with his eyes closed and heard DePena say, "That man is dead. Your father shot him."  (PFOF 18-19.)  Ana also confirmed that DePena told her and her sisters to report the false narrative.  (PFOF 20.)  MPD officers then spoke with Merced again who admitted that DePena instructed her and her sisters to report the false narrative.  (PFOF 21.)

MPD Detective Kenneth Grams conducted the crime scene investigation at the apartment and observed a handgun with a magazine on the living room floor.  (PFOF 22-23.)  Detective Grams inspected the handgun, removed the magazine, and located one spent casing in the chamber. (PFOF 24.)  He then provided those items to ID Technician John Vitrano who checked them for latent fingerprints, and who recovered a single latent fingerprint from the magazine (and no prints from the handgun, the unfired casings, or the spent casing).  (PFOF 25-26.)  ID Technician Vitrano prepared a report indicating that a single latent fingerprint was recovered from the magazine, that the fingerprint was pending identification, and that a new latent case file (Latent Case File # 96-01011-01) was assigned to the matter.  (PFOF 27.)  Detective Grams also prepared a report

indicating the same. (PFOF 28.) Both reports were included in the M-File and provided to the prosecutor (Assistant District Attorney Carol L. Kraft) before trial. (PFOF 29.)[1]

ID Technician Vitrano later determined the latent fingerprint recovered from the magazine did not match Sanchez's fingerprints, and this information was indicated in (and on the envelope of) Latent Case File # 96-01011-01. (PFOF 30.) In 1996, the results of fingerprint comparisons—whether positive or negative—were indicated in the latent case file, which was referenced in the reports included in the M-File and readily available upon request. (PFOF 31.)

On April 18, MPD Detective Moises Gomez (who spoke Spanish) interviewed Sanchez (who claimed he only spoke Spanish). (PFOF 32.) Detective Gomez read Sanchez his constitutional rights in English and Spanish and then proceeded with the interview. (PFOF 33.) MPD Detective George Irizarry, who spoke Spanish, was also present. (PFOF 34.) During the interview, Sanchez reported that: he was at Santiago's house with two Hispanic men to sell cocaine; the two men fought with him and Santiago, stole his cocaine, and then left; he then left with Santiago to search for the two men; he then went to DePena's apartment with Santiago where two unknown Hispanic men and one Hispanic female were present; one of the unknown Hispanic men shot Santiago; he did not observe the shooting; and he heard one gunshot. (PFOF 35.)

After the interview, Detective Gomez prepared a written statement for Sanchez in English. (PFOF 36.) He then read each sentence to Sanchez (in English and the translation in Spanish) and gave Sanchez the chance to amend/correct any information. (PFOF 37.) Detective Gomez also

---

[1] In 1996, all reports generated during an investigation at the MPD were placed in the respective investigation file ("M-File") and bates-stamped. A copy of the M-File was provided to the DA's Office and periodically updated during the investigation, including prior to trial. (PFOF 3.) It was also common for the DA's Office to request/obtain updated copies of the M-File during the investigation, including shortly before trial. (PFOF 4) (Kraft Aff., ¶ 12.) Here, MPD maintained an M-File for the Santiago murder investigation, "M3189." (PFOF 5.) The documents included therein were bates-labeled and provided to the DA's Office during the investigation and before trial. (PFOF 6, 116.)

read the entire statement (in English and the translation in Spanish) and handed it to Sanchez so he could review the same. (PFOF 38.) Sanchez then signed the statement. (PFOF 39.)

Detective Gomez also interviewed DePena on April 18 who reported that: at around 12:00 a.m., Sanchez told her that her brother was involved in a car accident and claimed he would drive her to the scene; Sanchez did not drive DePena to the scene but instead to Santiago's house; while there, Sanchez and Santiago informed DePena that two men stole $7,000 worth of cocaine from them; Sanchez then drove DePena to her apartment; after 1:00 a.m., Sanchez and Santiago came to DePena's apartment and started arguing with each other about the cocaine; DePena heard Sanchez demand the cocaine from Santiago; and DePena saw Sanchez pull out a gun, place it on Santiago's head, grab Santiago by the chest/neck area, and fire the gun one time. (PFOF 40-41.)

DePena also reported that, when the argument and shooting occurred, several individuals were outside of her apartment knocking on the door. (PFOF 42.) DePena stated that, after the shooting, she saw Sanchez leave the apartment, heard him shout, "let's go," and noticed him running westbound with several other individuals. (PFOF 43.) DePena indicated she then woke her children up, walked through the living room, and (while leaving) told her children, "See what your father did, because of drugs and a $7,000 rip off." (PFOF 44.) Finally, DePena admitted that she told her children to provide the false narrative because she was afraid and confused. (PFOF 45.) Detective Gomez then prepared a written statement for DePena. (PFOF 46.)

On April 19, Detective Gomez and DePena went to the DA's Office to speak with ADA Kraft about the murder. (PFOF 47.) Shortly thereafter, ADA Kraft charged Sanchez with first-degree intentional homicide. (PFOF 48.)

On April 22, MPD Detective Steven Spingola received a phone call from an anonymous male who indicated that Paulina Candelario Decupy ordered the shooting of Santiago, and that

4

Pacha Candelario or Pacha Candelario Decupy shot Santiago. (PFOF 49.) He also claimed those individuals could be located at/around the 1600 block of South 11th Street. (PFOF 50.) Detective Spingola asked the caller to identify himself and explain how he obtained the information, but the caller refused to do the same. (PFOF 51-52.) Detective Spingola then ran various combinations of those names in multiple law enforcement databases and contacted the post office to determine if those names were associated with any mailing addresses. (PFOF 53-54.) He also asked FBI Agent Gilbert Ewer to run searches for various combinations of those names. (PFOF 55.) Detective Spingola and Ewer did not locate any information. (PFOF 56-57.) The Wisconsin State Patrol also sent a message confirming that a search of those names, and all possible variations, yielded no results. (PFOF 58.) Detective Spingola prepared a report regarding the anonymous tip on July 10, which was included in the M-File and provided to ADA Kraft before trial. (PFOF 59.)

On April 23, the criminal court (Case F-962124) determined there was probable cause for the arrest and, on May 3, Sanchez (through his counsel) waived his right to a preliminary hearing. (PFOF 60-61.) Shortly thereafter, Milwaukee County Sheriff's Office informed Detective Gomez that DePena entered the witness protection program because she feared Sanchez's family/friends may cause her harm. (PFOF 62-63.)

On July 12, MPD Detective Charles Hargrove interviewed Roberto Morrobel (Sanchez's brother in-law). (PFOF 64.) At that time, Morrobel reported that Sanchez came to his house on April 18 and told him Pacha shot Santiago and Paulina Candileria Decupe ordered the shooting. (PFOF 65.) Detective Hargrove prepared a report summarizing the interview which was included in the M-File and provided to ADA Kraft before trial. (PFOF 66.)

On July 15, ADA Kraft asked the court to adjourn the trial because DePena could not be located. (PFOF 67.) The court adjourned the trial and issued a body attachment for DePena.

5

(PFOF 68.) On September 30, the court held a status conference where ADA Kraft indicated that Detective Gomez was travelling to New York on October 11, 1996 to track down DePena and her children they could testify at trial. (PFOF 69.) Detective Gomez located DePena in New York in October but was unable to find her children. (PFOF 70.)

Sanchez's trial started on October 14. (PFOF 71.) During a proceeding that occurred on October 14, Sanchez, through his counsel, stipulated to the admission of his written statement and indicated there are no issues to litigate regarding the same. (PFOF 74.) Sanchez, with an interpreter, also acknowledged that: he understood his constitutional rights during his interview; the interview was conducted in Spanish; he understood Detective Gomez during the interview; his statement was voluntary; and he waived his constitutional rights. (PFOF 75-76.) The court determined Sanchez's waiver was knowing and voluntary. (PFOF 77.)

On October 16, Detective Grams testified and was cross-examined at trial. (PFOF 78.) Detective Grams testified that, during the investigation, he removed the magazine from the handgun and conveyed those items for fingerprint testing. (PFOF 79.) He also testified that a latent fingerprint was recovered from the magazine. (PFOF 80.)

DePena also testified and was cross-examined on October 16. (PFOF 81.) DePena testified that she was married to Sanchez, shares two children with Sanchez, moved to Milwaukee to live near Sanchez, and has an amicable relationship with Sanchez. (PFOF 82.) DePena also testified that she was not at the failed drug transaction and that the shooting occurred as follows:

- The shooting occurred in her living room;
- She saw Sanchez arguing with Santiago a few minutes before the shooting;
- She saw Santos Sanchez pull a gun out of his jacket a few minutes before the shooting;
- She saw Santos Sanchez holding the gun a few minutes before the shooting;

6

- She saw Santos Sanchez "rubbing the gun" near Carlos Santiago's face and head a few minutes before the shooting;

- She was inside her apartment when the shooting occurred;

- Sanchez and Santiago were the only people in her living room when the shooting occurred;

- Pacha was not in her apartment when the shooting occurred and did not shoot Santiago;

- Sanchez "is the man who shot [] Santiago in [her] living room on April 18th."

(PFOF 83-87.) DePena also testified that she initially lied about how the shooting occurred because she thought Sanchez would tell the truth. (PFOF 88.) Finally, DePena testified that she and her children were placed in witness protection because Sanchez asked his family to "put pressure on me so that I could leave and not say anything," and that she left Wisconsin with her children before trial because of the pressure she received from Sanchez's family. (PFOF 90-91.)

On October 17, Detective Gomez testified and was cross-examined at trial. (PFOF 92.) Detective Grams testified that he interviewed Sanchez on April 18, and that during the interview Sanchez did not identify Pacha or his associates, indicated he did not observe the shooting, and stated DePena was not at the failed drug transaction. (PFOF 93.) Sanchez also took the stand on October 17 and testified that, during his interview, he indicated Pacha shot Santiago, he indicated he witnessed the shooting, he identified and described Pacha and his associates who were present, and he indicated DePena was at the failed drug transaction. (PFOF 94-95.)

On October 18, Sanchez's counsel delivered his closing statement and indicated:

> I missed that witness, that piece of evidence that came in and said the fingerprint on this magazine was the fingerprint of Santos Sanchez. I missed any fingerprint testimony that Santos Sanchez's fingerprints were on this gun. They had a fingerprint. That didn't come in…Now what does that conclude us to come to as far as the fingerprint found on the magazine? That fingerprint was not the fingerprint of Santos Sanchez.

(PFOF 96.) The jury found Sanchez guilty of first-degree intentional homicide. (PFOF 98.)

Sanchez then attended a sentencing hearing where his counsel indicated:

7

> I think the case was well represented to the jury, and that they had all of the facts before them and my assessment is that the jurors had to determine whether to believe Mr. Sanchez' ex-wife or whether to believe him. It is obvious from the verdict that they chose not to believe him, but to believe her as far as the version of facts that lead to his conviction.

(PFOF 99-100.) Sanchez was then sentenced to life imprisonment with parole eligibility after 40 years. (PFOF 101.) Shortly thereafter, Sanchez, through his counsel, filed an appeal arguing that the DA's Office violated his right to due process by denying him access to DePena and the children. (PFOF 102.) Sanchez did not argue he was denied due process in any other manner. (PFOF 103.) The Wisconsin Court of Appeals denied the appeal and held that Sanchez was not denied access to those witnesses. (PFOF 104.)

In 2018, the Wisconsin Innocence Project submitted an Open Records Request to MPD relating to the Santiago murder, and MPD produced, among other things, the M-File in response. (PFOF 105-106.) On February 12, 2021, the DA's Office and Sanchez's counsel stipulated that Sanchez was entitled to a new trial based on "newly discovered evidence that 'Pacha' existed and had an opportunity to commit the murder," and based on Sanchez's "trial counsel's constitutionally deficient performance for failing to conduct an independent investigation of 'Pacha.'" (PFOF 107.) Sanchez's judgment of conviction was vacated (based on the stipulation) on March 8, 2021, and the DA's Office then declined to re-try the case. (PFOF 108-109.)

In/before 1996, all prospective MPD officers were required to attend a 400-hour Law Enforcement Training Academy (as required under Wisconsin law) prior to their employment with MPD where they received training on, among other things, conducting investigations, interviewing witnesses, preparing written reports, and handling and disclosing evidence. (PFOF 110-111.)

In/before 1996, all new MPD officers were also required to complete a 120-hour Field Training Program (FTP) at the start of their employment. (PFOF 112.) During the FTP, all new officers were paired with experienced Field Training Officers who trained them on, among other

things, conducting investigations, interviewing witnesses, preparing reports, and handling and disclosing evidence. (PFOF 113.) All MPD officers were also required to complete 24 hours of yearly in-service training (as required under Wisconsin law) where they received additional training on these investigation-related topics. (PFOF 114.) Finally, all new *detectives* were required to complete an additional/separate training course where they received further training on these investigation-related topics. (PFOF 115.) All new detectives were also paired with, and supervised by, a senior detective "until [their] supervisor felt [they] were adequately trained to work [independently]." (PFOF 116.)

## STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, interrogatories, and affidavits establish there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is outcome determinative of an issue with the substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of showing the same. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The opposing party must then go beyond the pleadings and designate which material facts are genuinely disputed. *Anderson*, 477 U.S. at 248. The existence of some factual disputes does not defeat a properly supported summary judgment motion. *Id.*

## ARGUMENT

Sanchez alleges the following causes of action in his Complaint:

- **Claims 1 and 2**: Fourteenth Amendment Due Process and/or *Brady* claims against Detectives Gomez and Irizarry for allegedly: excluding the specific identity and description of "Pacha" and his associates in Sanchez's written statement; inaccurately indicating DePena was not at the failed drug transaction in his statement; mistranslating his statement; failing to investigate Pacha and his associates; failing to report his identification of Pacha to ADA Kraft; and coercing DePena.

9

- **Claim 3**: Due Process and/or *Brady* claim against Detective Spingola for allegedly: failing to investigate Pacha and his associates; and failing to disclose the anonymous tip.

- **Claim 4**: Due Process and/or *Brady* claim against all individual defendants for allegedly withholding fingerprint evidence.

- **Claim 5**: *Monell* claim against the City for allegedly maintaining a widespread practice of conducting flawed investigations and coercing/concealing evidence, and for allegedly failing to train, supervise, and discipline officers.

- **Claims 6, 7 and 8**: State law malicious prosecution and negligent/intentional infliction of emotional distress claims. Dkt. 1, pp. 20-29.[2]

For the reasons explained below, all claims should be dismissed as a matter of law.

## I. LEGAL STANDARD GOVERNING DUE PROCESS AND *BRADY* CLAIMS.

To establish a Fourteenth Amendment Due Process violation based on fabrication of evidence, a plaintiff must prove: defendant deliberately falsified evidence in bad faith; the evidence was used at trial; the evidence is material; and plaintiff was damaged as a result. *Zambrano v. City of Joliet*, 141 4th 828, 831 (7th Cir. 2025). Evidence is material if "there is a reasonable likelihood [it] affected the judgment of the jury." *Id.*

To establish a *Brady v. Maryland*, 373 U.S. 83 (1963) violation against a detective, a plaintiff must prove: the detective withheld material evidence during the criminal proceedings by not disclosing it to the prosecutor; the evidence was favorable; and plaintiff was prejudiced by the withholding. *U.S. v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). Evidence "is material [] if there is a reasonable probability that, had the evidence been disclosed … the result of the [criminal] proceeding would have been different." *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 644 (7th Cir. 2008). Evidence is not suppressed "if the prosecutor was aware of it," if the prosecutor "obtained

---

[2] The Complaint also includes a non-substantive state law indemnification claim against the City of Milwaukee, which cannot be maintained if the Court dismisses the substantive claims.

[it] from another source," or if it was "otherwise available to [plaintiff] through the exercise of reasonable diligence." *Moran v. Calumet City*, 54 F. 4th 483, 492 (7th Cir. 2022); *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Because "negligent conduct does not offend the Due Process Clause," "evidence is considered suppressed … only if [the detective] acted intentionally or at least recklessly in failing to turn it over to the prosecution." *Moran*, 54 F. 4th at 493.

## II. SANCHEZ CANNOT PROVE A DUE PROCESS OR *BRADY* VIOLATION.

### The Custodial Interview/Written Statement

As a threshold matter, all federal claims relating to the custodial interview/written statement should be dismissed because Sanchez stipulated to the admission of such evidence and waived the right to pursue any constitutional challenges regarding the same. The transcripts from the criminal proceedings confirm the same:

> **Prosecutor**: There is a custodial statement the defendant made.
>
> **D's Counsel**: …. I did review the circumstances under which that statement was made with Mr. Sanchez. After having that discussion with him and explaining his rights to him regarding a hearing, regarding that statement, he and I both agreed there was no issue to litigate.
>
> **Court**: So he acknowledges that he was Mirandized as required by law?
>
> **D's Counsel**: That is correct.
>
> **Court**: And he acknowledges that the statement – that he waived his constitutional rights and agreed to make the statement that is recorded by the police without an attorney present; is that correct?
>
> **D's Counsel**: Correct.
>
> **Court**: And he also agrees that the statement was otherwise voluntary? In other words, it was not coerced?
>
> **D's Counsel**: That's correct. In my discussions with Miss Kraft … I don't think she had an intent to use it in her case in chief anyway, but for the record, if she wishes to, the defense has no objection.
>
> **Court**: A bilingual officer took the statement?
>
> **D's Counsel**: It was Detective Gomez, correct.

(10/14/96 Hearing Transcript, pp. 19-22.) The transcripts also show that the court determined Sanchez's waiver was knowing and voluntary:

**Court**: Mr. Sanchez, you agree that when you were questioned by the police in custody, they advised you of your constitutional rights first; is that correct?

**Sanchez**: Yes.

**Court**: And that you understood those rights; is that correct?

\*\*\*

**Sanchez**: Yes.

\*\*\*

**Court**: And all of this was done in Spanish with this detective?

\*\*\*

**Sanchez**: Yes.

**Court**: And he conducted that interview in Spanish?

**Sanchez**: In Spanish, yes.

**Court**: And you understood what he was telling you?

**Sanchez**: Yeah, that I was being accused of a crime, yes.

**Court**: And he didn't coerce that statement from you, did he?

**Sanchez**: No, he did not force me.

**Court**: It was a voluntary discussion you were having, correct?

**Sanchez**: Yes, it was voluntary.

**Court**: I'll accept the defendant's waiver of his right to contest the admissibility of the statement….

*Id.*; *U.S. v. Millhouse*, 2013 WL 5467743 (E.D. Penn. 2013) ("[A]ssuming Millhouse is challenging the voluntariness of this statement, his challenge must fail because he knowingly withdrew his suppression motion [] at a hearing before trial. He therefore waived any constitutional challenge he may have had in this regard…. Upon questioning … Millhouse maintained that it was his voluntary choice not to challenge the statement's admissibility.").[3]

---

[3] *Stolts v. U.S.*, 2010 WL 1257681 (E.D. Mo. 2010) ("Because Movant waived his right to have a hearing on the motions to suppress evidence and statements, he cannot now claim that his statements to police were the result of coercion…. Movant stated that he understood his rights and that he wanted to waive those rights. Because Movant waived his right to have a hearing on any pretrial motions and the Magistrate Judge found that the Movant's waiver was knowing and voluntary, he cannot claim that his constitutional rights were violated by the admission of his statements."); *Griffin v. U.S.*, 2020 WL 7770827 (E.D. Mo. 2020) ("Because Movant waived his right to have a hearing on any pretrial motion and the Magistrate found that the Movant's waiver was knowing and voluntary, he cannot claim that his constitutional rights were violated by the admission of his statements.").

In any event, Sanchez cannot prove a due process or *Brady* violation relating to the custodial interview/written statement for the following reasons:

***First***, Sanchez knew what information he *allegedly* provided during his interview, knew what information Detective Gomez included in his statement; and cross-examined Detective Gomez regarding the same at trial. *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) ("[T]he duty to disclose falls out, because Gauger knew what he said at the interrogation. The problem was not that the evidence useful to him was being concealed, the problem was that the detectives were giving false evidence. Gauger wants to make every false statement by a prosecution witness the basis for a civil rights suit, on the theory that by failing to correct the statement the prosecution deprived the defendant of *Brady* material, that is, the correction itself."); *Mosley v. City of Chicago*, 2007 WL 2608517 (N.D. Ill. 2007) ("Plaintiff's complaint that 'no General Progress Reports regarding [his] interrogation were ever turned over to the defense' does not violate *Brady*, because Plaintiff himself was present at the interrogation and could bring this evidence to light in trial.").

A due process claim was dismissed for similar reasons in *U.S. v. Mota*, 685 F.3d 644 (7th Cir. 2012). In *Mota*, plaintiff and his friend (Ponce) were arrested for attempting to distribute cocaine. *Id.* On the first day of trial, plaintiff's counsel discovered that an officer interviewed Ponce after the arrest, and that during the interview Ponce accepted responsibility for the crime, indicated plaintiff was not involved, and *allegedly* stated someone else (Teflon) delivered the drugs. *Id.* At trial, Ponce testified that he reported Teflon during his interview, while the officer testified that Ponce never mentioned Teflon. *Id.* at 648. The court held that, "[b]ecause the defense was able to preset all of this evidence to the jury … we cannot say that the [] failure to turn over the evidence to the defense at an earlier time created a reasonable probability that the trial proceedings would have been different." *Id.* The court also held that plaintiff received due process

13

and was not prejudiced because he "was able to cross-examine [the officer] on the differences between his account and that of Ponce." *Id.*

As in *Mota*, Sanchez testified at trial and "cross-examine[d] [Detectives Gomez] on the differences between [his] account and that of [Sanchez]." Sanchez testified that during his interview he indicated Pacha shot Santiago, he indicated he witnessed the shooting, he described Pacha and his associates, and he indicated DePena was at the failed drug transaction. Detective Gomez testified that Sanchez did not identify Pacha or his associates, indicated he did not observe the shooting, and stated DePena was not at the failed drug transaction. Accordingly, as in *Mota*, Sanchez received due process and cannot prove a *Brady* violation.

**Second**, the information *allegedly* omitted from the statement is not material. Courts have held that information omitted from a report/statement is not material if it was presented at trial and the jury returned a guilty verdict. *Mota*, 685 F.3d at 648 ("Because the defense was able to preset all of this evidence to the jury … we cannot say that the [] failure to turn over the evidence to the defense at an earlier time created a reasonable probability that the trial proceedings would have been different."); *Benavides v. McGrath*, 131 Fed. Appx. 595, *1 (9th Cir. 2005) (officer mistranslated information in statements; court held it was not material because witnesses explained statements at trial and the jury returned guilty verdict). Here, it is undisputed that Sanchez told the jury he reported the allegedly omitted information during his interview, and that the jury still returned a guilty verdict. Such information is therefore not material.

DePena was also cross-examined at trial. DePena testified that she was married to Sanchez, shares two children with Sanchez, moved to Milwaukee to live near Sanchez, and has an amicable relationship with Sanchez. Notably, DePena also testified the shooting occurred as follows:

- The shooting occurred in her living room;
- She saw Sanchez arguing with Santiago a few minutes before the shooting;

- She saw Sanchez pull a gun out of his jacket a few minutes before the shooting;

- She saw Sanchez holding the gun a few minutes before the shooting;

- She saw Sanchez "rubbing the gun" near Santiago's face and head a few minutes before the shooting;

- She was inside her apartment when the shooting occurred;

- Sanchez and Santiago were the only two people in her living room when the shooting occurred;

- "Pacha" was not in her apartment when the shooting occurred;

- "Pacha" did not shoot Santiago; and

- Sanchez "is the man who shot [] Santiago in [her] living room on April 18th."

The information Sanchez claims was omitted from his statement is self-serving, does not undermine DePena's eyewitness testimony, and does not "put the whole case in such a different light as to undermine the confidence of the verdict." It is not material. *Bernal v. Small*, 2009 WL 3517664, at *13 (C.D. Cal. 2009) ("[The] disclosure to the jury of Petitioner's self-serving statements to the police shortly after his arrest would not have changed the outcome of this case."); *U.S. v. Danielson*, 325 F.3d 1054, 1074 (9th Cir. 2003) ("The favorable material [Danielson] contends should have been turned over to him amounts to nothing more than his … protestations of innocence. [T]hese statements were neither favorable nor material.").

*Third*, there is no evidence of bad faith. A due process claim was dismissed for similar reasons in *Zambrano v. City of Joliet*, 141 F.4th 828 (7th Cir. 2025). Plaintiff there claimed a detective falsified his report by misstating the information he provided during an interview. *Id.* at 832. The court dismissed the claim because plaintiff "failed to present any evidence of the requisite bad faith." *Id.* He "merely presents his own statement that he did not tell [the detective] that information. That allows a conclusion that the statement was false but … does not allow a reasonable inference of bad faith." *Id.* The court held that, if anything, the evidence shows the detective simply made a mistake because he prepared the report after a "day-long investigation" and after interviewing other witnesses. *Id.* at 831; *Moran*, 54 F.4th 483 ("[Plaintiff] bears the

15

burden to produce sufficient admissible evidence on every element of his claims, including the defendant's state of mind … and on an empty record the plaintiff loses.").

As in *Zambrano*, Sanchez "presents his own statement that he [told detectives] [the foregoing] information" during his interview.  However, there is no evidence of bad faith.  To the contrary, the record shows various measures were taken to prepare an accurate statement and it is reasonable to infer any mistakes were inadvertent.  It is undisputed that Detective Gomez first conducted the interview in Spanish, then prepared the statement in English (requiring him to summarize and translate the information provided from Spanish to English), and then read each sentence to Sanchez in Spanish (requiring him to translate the information back to Spanish). Detective Gomez then read the entire statement several times (in Spanish) so Sanchez could make any corrections and handed the statement to Sanchez so he could independently view and sign the same.  Notably, if Pacha or any other names were omitted in bad faith, Detective Gomez would not have asked Sanchez to look at the statement because Sanchez would have noticed such names (which are spelled/look identical in English and Spanish) are not included therein.

### Alleged Failure to Investigate Pacha and His Associates, Failure to Report Sanchez's Identification of Pacha and His Associates to ADA Kraft, and Failure to Disclose the Anonymous Tip

For the following reasons, Sanchez cannot prove a due process or *Brady* violation relating to the alleged failure to investigate Pacha and his associates.

***First***, courts have held there is no right to a specific investigation, and once "officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in hopes of uncovering potentially exculpatory evidence." *Nugent v. Hayes*, 88 F. Supp. 2d 862, 868 (N.D. Ill. 2000) ("[I]t is not the duty of the police to perform the perfect investigation, and 'one suspected of committing a crime has no constitutional

right to an investigation by police which will uncover all exculpatory evidence.' In fact, 'once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in hopes of uncovering potentially exculpatory evidence.'"); *Spiegel*, 196 F.3d at 725 ("[T]he police need not automatically interview available witnesses…. Good police practice may require interviews, but the Constitution does not require police to follow the best recommended practices. There is a gap, often a wide one, between the wise and the compulsory. To collapse those two concepts is to put the judicial branch in general superintendence of the daily operation of government, which neither the fourth amendment nor any other part of the Constitution contemplates.").[4] The detectives here had probable cause to arrest Sanchez based on the information DePena and her children provided during their interviews. The detectives were not constitutionally required to "conduct any further investigation in hopes of uncovering potentially exculpatory evidence," to "conduct an investigation for [Sanchez]," or to "assist in the presentation of [Sanchez's] case."

***Second***, Sanchez's allegations are not supported by the evidence. It is undisputed Detective Spingola received a call from an anonymous male who claimed that Pacha Candelario shot Santiago and Paulina Candelario Decupy ordered the shooting, and that the tipster claimed Pacha could be located in/near the 1600 block of South 11th Street. Detective Spingola ran those names (and several variations) through multiple databases and checked with the post office to determine if they were associated with a mailing address. Detective Spingola's report and the messages from Wisconsin State Patrol (WSP) confirm such steps were taken. It is also undisputed

---

[4] *Bolden v. City of Chicago*, 293 F. Supp. 3d 772, 780 (N.D. Ill. 2017) ("Bolden asserts a final due process claim: that the defendant officers' failure to investigate his alibi … constitu[tes] a denial of due process. The parties agree that there is generally no due process right to a specific investigation by the police. And the prosecution does not have to conduct an investigation for the accused, or assist in the presentation of the accused's case…. [T]he Seventh Circuit … has not held that a failure to investigate, in and of itself, constitutes a due process violation….").

that no one located any information regarding those individuals. The Constitution did not require any further investigation regarding the same.[5]

Next, as explained below, Sanchez cannot prove a due process or *Brady* violation relating to the failure to report his alleged identification of Pacha and his associates to ADA Kraft.

*First*, the detectives were not required to provide ADA Kraft with such information because Sanchez was aware of the same, and because "*Brady* rights run to the criminal defendant, not to the prosecution." *Sornberger v. City of Knoxville, Ill.,* 424 F.3d 1006, 1029 (7th Cir. 2006) ("[Plaintiff] complains [the officers] failed to disclose the circumstances of her interrogation. However, [plaintiff] already was familiar with those circumstances. [Plaintiff] knew herself what occurred during the interrogation, and the police were under no *Brady* obligation to tell her again that they coerced her into confessing. Nor can *Brady* serve as the basis of a cause of action for failing to disclose these circumstances to the prosecutor [because] *Brady* rights run to the criminal defendant, not to the prosecution.").

*Second*, Sanchez's allegations are not supported by the evidence. Detective Hargrove's report indicates that ADA Kraft asked him to interview Morrobel on July 12, 1996 because he "may have information relative to the [] homicide." It also indicates that, during the interview, Morrobel stated that Sanchez told him Pacha and his associates were responsible for the shooting. Detective Hargrove's report was placed in the M-file and provided to ADA Kraft before trial. (Kraft Aff., ¶ 8). Indeed, ADA Kraft indicated she "reviewed all the police reports that were generated in the investigation of this case" during a hearing that occurred one week before trial.

---

[5] Sanchez now alleges that "Pacha Candelario's" actual name is "Fausto Candelario;" however, it is undisputed that neither Sanchez, the anonymous tipster, nor anyone else informed Defendants of the same prior to the conviction. In fact, it is still unknown to this date what "Pacha's" actual/real name is.

18

Next, for the following reasons, Sanchez cannot prove a due process or *Brady* violation relating to the alleged failure to disclose the anonymous tip to ADA Kraft.

**First**, Sanchez's allegations are not supported by the evidence. As explained above, Officer Spingola prepared a report explaining the anonymous tip which was placed in the M-file and provide to ADA Kraft before trial. (Kraft Aff., ¶ 7.)

**Second**, the information is not material. As explained above, DePena—a credible eyewitness who was cross-examined and subject to the penalties of perjury—provided considerable testimony regarding the events at issue, indicated that Sanchez "is the man who shot [] Santiago in [her] living room on April 18th," and confirmed that Pacha did not shoot Santiago. The fact that some anonymous tipster—who refused to provide his name or indicate "how he had come to obtain [the] information," and who was never under oath or cross-examined—claimed that Pacha was responsible does not undermine DePena's eyewitness testimony or "put the whole case in such a different light as to undermine the confidence of the verdict." Indeed, courts have held that anonymous tips have little, if any, evidentiary value and are likely inadmissible at trial. *Hammond v. Hall*, 586 F.3d 1289, 1318 (11th Cir. 2009) ("[T]he allegation rests entirely on an anonymous tip phoned in to a television station…. For all the record shows, it could have been phoned in by one of Hammond's friends or family members. Anonymous tips are not admissible into evidence to prove the truth of the matter stated in the tip."); *Miles v. Burris,* 54 F.3d 284, 288 (7th Cir.1995) ("testimony about the content of the anonymous tip was inadmissible hearsay").

### Alleged Failure to Disclose Fingerprint Evidence

For the following reasons, Sanchez cannot prove a due process or *Brady* violation regarding the alleged failure to disclose fingerprint evidence; i.e., that a latent fingerprint was recovered from the magazine and did not match Sanchez's fingerprints.

19

*First*, Sanchez's counsel was aware of this information. Indeed, he indicated the same during his closing statement: "Interestingly enough on this magazine was a fingerprint. A fingerprint…. That fingerprint was not the fingerprint of Santos Sanchez…. Someone else handled that gun. Somebody else handled that magazine." *Kelly v. Secretary for Dep't of Corr.*, 377 F.3d 1317, 1367 (4th Cir. 2004) (failure to disclose negative fingerprint report was not a *Brady* violation because defense counsel was aware the fingerprints did not match defendant's).

Similar circumstances were addressed in *Moran*, 54 F.4th 483. Plaintiff there was arrested for attempted murder with a firearm in Calumet City. *Id.* at 488. The detectives interviewed a witness (Rostro) who indicated plaintiff was the shooter and Bobby Loera was present. *Id.* at 489. Rostro also identified plaintiff and Loera in a photo lineup. *Id.* Before trial, a Cook County forensic scientist sent Calumet City's crime scene technician a ballistics report associated with a firearm used in a subsequent shooting. *Id.* The report confirmed the shell casings recovered in the Calumet City shooting were discharged from the same firearm used in the subsequent shooting, and that the firearm was owned by Nicholas Chavez. *Id.* However, the report was never provided to plaintiff's counsel or the prosecutor. *Id.* The court nevertheless dismissed the *Brady* claim because the prosecutor *was aware of the content of the report*. *Id.* at 493. Plaintiff also argued the detectives suppressed Rostro's statements about seeing Loera and his identification of Loera in a lineup because, although the prosecutor knew about the identification, "no reports about this evidence were ever given to the prosecution." *Id*. at 495. The court held that, although the detectives "did not produce evidence of [Rostro's] identification and statements about Loera in [plaintiff's] preferred form, the record establishes that the prosecution was aware of the evidence. Moran's *Brady* claim based on this evidence therefore fails." *Id.* at 496.

**Second**, the latent case file was referenced in multiple reports, was readily available, and could have been obtained with reasonable diligence before trial. *Boss*, 263 F.3d at 740 (evidence that was "otherwise available … through the exercise of reasonable diligence" is not suppressed). Multiple reports indicate a latent fingerprint was recovered from the magazine, indicate a fingerprint comparison is pending, and reference the latent case file associated with the same. ID Technician Vitrano's report indicates that "a latent print [was] developed on the surface of the handgun magazine" and that he "assigned this latent print to latent case # 96-01011-01." Detective Grams' report also indicates that "ID Technician John VITRANO [] checked [the firearm and magazine] for any latent fingerprints, latent case # 96-1011. It should be noted that one latent fingerprint was recovered from the magazine of this firearm with identification pending." Both reports were included in the M-file and provided to ADA Kraft before trial. (Kraft Aff., ¶¶ 10, 11) (indicating she reviewed both reports before trial and was aware of Latent Case File # 96-01011 before trial). ADA Kraft and Sanchez's counsel could have readily obtained Latent Case File # 96-01011-01 which indicates the fingerprint did not match Sanchez's fingerprints. Notably, ADA Kraft even included ID Technician Vitrano in her trial witness list, and Detective Gomez even testified that a latent fingerprint was recovered from the magazine. This further shows that ADA Kraft and Sanchez had access to the ID Technician and fingerprint information.

**Third**, the fingerprint information is not material. As noted above, Sanchez's counsel informed the jury that a fingerprint was recovered from the magazine, and that it did not match Sanchez's fingerprints. The jury still returned a guilty verdict. *Squires v. Dugger*, 794 F. Supp. 1568, 1578 (M.D. Fla. 1992) (dismissing claim because undisclosed fingerprint report with nonmatching prints would not have led to acquittal, and jury heard fingerprints did not match petitioner's, "the exact point the petitioner needed to make").

*Fourth*, courts have held that negative fingerprint results are not material if a credible eyewitness testifies and identifies the defendant as the assailant. *Paddy v. Beard*, 2008 WL 8971156 (E.D. Penn. 2008) (negative fingerprint results not material given the testimony of eyewitnesses); *Lieberman v. Washington*, 128 F.3d 1085 (7th Cir. 1997) (undisclosed fingerprint results not material because eyewitness testified defendant committed crime); *Whitt v. Duckworth*, 46 F.3d 1134, *2 (7th Cir. 1994) (undisclosed report showing negative palm print results not material because eyewitnesses identified criminal defendant at trial).

As noted above, DePena testified that: the shooting occurred in her living room; she observed Sanchez and Santiago arguing a few minutes before the shooting; she observed Sanchez pull a firearm from his jacket and "rub[] the gun" near Santiago's face/head shortly before the shooting; Sanchez and Santiago were the only two individuals in her living room when the shooting occurred; Pacha was not present; and Sanchez "is the man who shot [] Santiago in [her] living room on April 18th." The fact that a single latent fingerprint recovered from the magazine did not match Sanchez's fingerprints does not contradict DePena's eyewitness testimony or "put the whole case in such a different light as to undermine the confidence of the verdict."

*Finally*, the detectives were not constitutionally required to prepare an additional report noting the negative fingerprint results. The "case law makes [it] clear that *Brady* does not require the creation of exculpatory evidence," including a report noting the negative results included in a fingerprint case file. *Saunders-El v. Rohde*, F.3d 556, 562 (7th Cir. 2015); *Brown v. City of Miami*, 2009 WL 1765984, at *2 (S.D. Fla2009), aff'd, 386 F. App'x 861 (11th Cir. 2010) ("There is no constitutional requirement that an examiner prepare a written report on a latent print that does not match a defendant. As long as the defense is told about the existence of non-matching prints, *Brady* is satisfied."); *Brown v. City of Miami*, 386 F. App'x 861, 863 (11th Cir. 2010) ("[T]o the

22

extent that Brown is claiming that the prosecutor suppressed evidence by failing to generate a second fingerprint report, *Brady* does not require the state to generate reports documenting its evidence.").

### Alleged Coercion of Christina DePena.

There is no evidence that the detectives in this case coerced DePena. In fact, DePena testified that she "asked to be referred to Witness Protection" and left Wisconsin because **Sanchez** "told his brother-in-law and his sister to put pressure on me so that I could leave and not say anything." In any event, courts have held that "coercing or otherwise soliciting a witness to falsely incriminate a suspect during a criminal investigation does not violate any established constitutional rights—except perhaps the rights of the witness who is coerced." *Fields v. Wharrie*, 740 F.3d 1107, 1117 (7th Cir.2014); *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994) ("Coercing witnesses to speak … is a genuine constitutional wrong, but the persons aggrieved [are the witnesses] rather than [the arrestee].").

## III.    THE DETECTIVES ARE PROTECTED BY QUALIFIED IMMUNITY.

Government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This defense is known as qualified immunity and allows for reasonable errors "because officials should not err always on the side of caution [for the] fear of being sued." *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998). Qualified immunity "erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).

23

A two-prong test exists to determine if qualified immunity applies. A plaintiff must first show the facts are sufficient to prove an underlying violation. *Rakovich v. Wade*, 850 U.S. 1180, 1209 (1988). A plaintiff must then prove the constitutional right was clearly established before the date of the incident. *Id.* To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). The law must provide "fair warning" to officials that the complained-of conduct is unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). A clearly established right cannot be shown with "high levels of generality." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). A plaintiff must provide "controlling authority" or "a robust consensus of cases of persuasive authority" indicating the conduct at issue is unconstitutional. *Id.* at 2023; *Wood v. Moss*, 134 S.Ct. 2056, 2067 (2014) (constitutional right not clearly established without similar prior case law); *Stanton v. Sims*, 134 S.Ct. 3, 145 (2013) (qualified immunity applied where precedent "did not lay down a categorical rule for all cases" and was interpreted "too broadly."). The Supreme Court "has repeatedly told courts … not to define clearly established law at a high level of generality." *City of Escondido, California v. Emmons*, 139 S.Ct. 500, 503 (2019).

The federal claims alleged against the detectives in this case are barred under the first prong of qualified immunity because, as explained above, Sanchez cannot establish an underlying violation. They are also barred under the second prong for the following reasons:

With respect to the ***custodial interview/written statement***, it was not clearly established that a detective commits a due process and/or *Brady* violation by allegedly omitting certain information in a written statement where, as in this case, the defendant testifies and cross-examines the detective regarding the allegedly omitted information, and the jury still returns a guilty verdict.

24

With respect to the alleged ***failure to investigate Pacha or his associates,*** it was not clearly established that a detective—who has probable cause to arrest a suspect—commits a due process and/or *Brady* violation where, as in this case, he runs the name of an allegedly alternate suspect though multiple law enforcement databases, he checks with the post office for an associated mailing address, he contacts the FBI for assistance, and he does not locate any information regarding that individual. Nor was it clearly established that a detective is constitutionally required to take additional steps to investigate that purported individual.

With respect to the alleged ***failure to report Sanchez's identification of Pacha and the anonymous tip to ADA Kraft,*** it was not clearly established that a detective commits a due process and/or *Brady* violation where, as in this case, the criminal defendant was aware of such information, and such information was included in the reports and known the prosecutor.

With respect to the alleged failure ***to disclose fingerprint evidence***, it was not clearly established that a detective commits a due process and/or *Brady* violation where, as in this case, the criminal defense counsel was aware of such evidence before trial and such information was readily available. Nor was it clearly established that the lack of a criminal defendant's fingerprints on a murder weapon is material where, as in this case, the jury considers the same and still returns a guilty verdict. Or where, as in this case, an eyewitness testifies, provides significant details about the murder, and indicates she observed the criminal defendant commit the murder.

Finally, with respect to the alleged ***coercion of DePena,*** the case law indicates that "coercing or otherwise soliciting a witness to falsely incriminate a suspect during a criminal investigation does not violate any established constitutional rights—except perhaps the rights of the witness who is coerced."

25

## IV.     ALL *MONELL* CLAIMS SHOULD BE DIMSISSED AS A MATTER OF LAW.

All *Monell* claims alleged against the City should be dismissed because Sanchez cannot

establish an underlying violation for the reasons explained above.  *City of Los Angeles v. Heller*,

475 U.S. 796 (1986) (*Monell* claims should be dismissed where plaintiff cannot prove underlying

violation).  Dismissal is also warranted because the record does not support a *Monell* claim.

A "municipality cannot be held liable under § 1983 on a *respondeat* superior theory."

*Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978).  Municipal liability

exists only "when execution of a government's policy or custom, whether made by its lawmakers

or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."

*Id.* at 694.  A municipality can be held liable if: (1) it maintained a written policy that caused the

deprivation; (2) it maintained a "widespread practice" that was so permanent and well-settled as

to constitute a "custom or usage" with the force of law; or (3) the violation was caused by a person

with final policymaking authority.  *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

With respect to the widespread custom and practice theory, a "plaintiff must show that

policymakers were deliberately indifferent as to the known or obvious consequence."  *Thomas v.

Cook Cnty. Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2009).  Under this stringent standard, "it is not

enough to demonstrate that policymakers could, or even should, have been aware of the unlawful

activity because it occurred more than once."  *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir.

2006).  There must be "evidence demonstrating that the unlawful practice was so pervasive that

acquiescence on the part of policymakers was apparent and amounted to a policy decision."  *Id.*

Sanchez alleges that MPD maintained a widespread custom and practice of conducting

flawed investigations and coercing/concealing evidence, and that MPD failed to train, supervise

and discipline officers regarding the same.[6]  Sanchez cannot prove a *Monell* claim because there is no pattern of prior substantiated due process or *Brady* violations stemming from conducting flawed investigations or coercing/concealing evidence.  Nor do the cases cited in the Complaint establish the same.[7]  *Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197, 1207 (E.D. Wis. 2014) involves officers who interviewed a witness that provided significant information regarding a suspect, who intentionally destroyed all interview notes, who did not prepare any reports regarding the interview, and who did not mention the suspect in any report.  The court held that "creating and then destroying separate notes in an attempt to skirt *Brady* would be impermissible."  *Id.* at 1209.  *Stinson v. City of Milwaukee*, 2013 WL 5447916 (E.D. Wis. 2013) involves an officer who intentionally altered the identification of a missing tooth following his discussion with an odontologist to obtain a favorable expert opinion regarding bite mark patterns.  *Id.*

    *Ott* and *Stinson* are inapplicable because they do not involve violations similar to those alleged in this case.  The detectives here maintained all handwritten notes, prepared reports summarizing all interviews, and altered no documents.  *Terry v. County of Milwaukee*, 2018 WL 2567721 (E.D. Wis. 2018) (custom/practice "must be closely related to the ultimate injury that the plaintiff suffered").  Moreover, *Ott* and *Stinson* involve a single, isolated incident and do not reference any prior examples where MPD officers conducted a flawed investigation or coerced/concealed evidence.  *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' …, or even three, *Gable*, 296 F.3d at 538 ('[T]hree incidents … do not amount to a persistent and widespread practice.').").

---

[6] Sanchez does not allege any *Monell* claims under the first or third theory of liability.

[7] *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) and *Wilber v. City of Milwaukee, et al.*, Case No. 23-cv-051 are inapplicable because they involve investigations and conduct that occurred after 1996.

Moreover, even assuming *arguendo* that MPD maintained such a widespread custom and practice, there is no evidence that officials were "aware of [any] risk created by" the same, or that any such deficiency was the "moving force" behind the violations alleged in this case.

Presumably, Sanchez will argue that MPD maintained a widespread custom and practice whereby, "if there was no match between a criminal suspect and an item of interest in terms of a fingerprint analysis, there would be no supplemental report drafted" indicating the same. This argument is unavailing because the results of all fingerprint comparisons (including negative results) were included in the respective latent fingerprint file, which was referenced in numerous reports provided to the prosecutor and readily available. As explained above, the "case law [also] makes [it] clear that *Brady* does not require the creation of exculpatory evidence" and does not "require the state to generate reports documenting its [fingerprint] evidence." *Saunders-El*, F.3d 556 at 562; *Brown v. City of Miami*, 2009 WL 1765984, at *2; *Brown*, 386 F. App'x at 863.

Nor can Sanchez establish a *Monell* claim under a theory of inadequate training, supervision, or discipline. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The alleged failure must amount to "deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This is "a stringent standard of fault," which "require[es] proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). To show deliberate indifference, a plaintiff must prove policymakers: (1) had actual or constructive notice that a particular defect in training existed and caused the violation; and (2) disregarded such notice and retained the defective training program. *Id.* "[T]he need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that

the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. The focus must be on the adequacy of the training program itself, not on an individual officer's acts. *Canton*, 489 U.S. at 390-91 (That a "particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.").

The record here shows that MPD provided constitutionally sufficient training regarding, among other things, conducting investigations, interviewing witnesses, preparing written reports, and handling and disclosing evidence in/prior to 1996. Prior to their employment, all prospective officers were required to attend a 400-hour Law Enforcement Training Academy (as required under Wisconsin law) where they received training on, among other things, conducting investigations, interviewing witnesses, preparing written reports, and handling and disclosing evidence. All new officers were then required to complete a 120-hour Field Training Program (FTP) where they were paired with experienced Field Training Officers who trained them on, among other things, those investigation-related topics. During their employment, all officers were also required to complete 24 hours of yearly in-service training (as required under Wisconsin law) where they received additional training on, among other things, those investigation-related topics. All new *detectives* were also required to complete an additional/separate training course where they received further training on those investigation-related topics. New detectives were also paired with, and supervised by, a senior detective "until [their] supervisor felt [they] were adequately trained to work [independently]." Reginato Aff., Ex., [], Grams Depo., p. 15:1-9.

Finally, dismissal is also warranted because there is no evidence that MPD officials were aware of any deficiencies regarding its training, supervision, or disciplinary program in/prior to

1996, and because Sanchez cannot prove any such deficiencies caused the violations alleged in this case, even assuming *arguendo* such deficiencies existed.

## V.     THE STATE LAW CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW.

### a.     The Court Should Decline Supplemental Jurisdiction.

Under 28 U.S.C. § 1367(c)(3) "district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction…." *See Harvey v. Town of Merrillville*, 649 F.3d 526, 533 (7th Cir. 2011) ("[T]he usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice."). If the Court dismisses all federal claims alleged in this case, it should decline supplemental jurisdiction over all state law claims.

### b.     The Claims are Barred Under Wis. Stats. § 893.80(1d) and § 893.80(4).

Wis. Stat. § 893.80(1d)(a) requires, as a prerequisite to bringing a lawsuit against a municipality, that written notice be served within 120 days of the event. The notice must identify the circumstances that occurred which give rise to the claim. *Probst v. Winnebago Co.*, 225 Wis. 2d 753, 593 N.W.2d 478 (Ct. App. 1999). Wis. Stat. § 893.80(1d)(b) also requires a party to serve the municipality with an itemized statement of the relief sought. *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 28, 235 Wis. 2d 610, 612 N.W.2d 59. The purpose of Wis. Stat. § 893.80(1d) is to provide the municipality with an opportunity to avoid litigation and/or budget for a settlement or litigation. *Id.* ¶ 22. "Failure to comply with the statute constitutes grounds for dismissal of the action." *Casteel v. Vaade*, 167 Wis. 2d 1, 10, 481 N.W.2d 277 (1992). Sanchez did not submit a

written notice of the circumstances or an itemization of the relief sought prior to filing this lawsuit. His state law claims should therefore be dismissed.

The state law claims alleged here are also barred under Wis. Stat. § 893.80(4), which protects municipalities and their employees from any liability for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." *Bicknese v. Sutula*, 260 Wis. 2d 713, 727, 600 N.W.2d 289 (2003); *Lodl v. Progressive Northern Ins. Co*., 2002 WI 71, ¶ 17, 253 Wis. 2d 323, 646 N.W.2d 314. This has been "interpreted to include any act that involves the exercise of discretion and judgment." *Id.* A discretionary act involves the "exercise of judgment in the application of a rule to specific facts." *Willow Creek v. Town of Shelby*, 2000 WI 56, ¶ 25, 235 Wis. 2d 409, 611 N.W.2d 693. The statute provides broad immunity from suit. *Lodl*, 2002 WI 71, ¶ 20. Whether immunity applies presents a question of law. *Id.*, ¶ 17.

The acts and decisions at issue here—including, but not limited to, whether to bring criminal charges, whether to continue the criminal proceedings, and whether/how to investigate the shooting—all required the exercise of judgment and discretion. They are therefore protected under § 893.80(4). *Recore v. Cnty. of Green Lake*, 2016 WI App. 33, 368 Wis. 2d 282, 879 N.W.2d 131 (scope of investigation discretionary and protected by immunity); *Barillari v. City of Milwaukee*, 194 Wis. 2d 247, 255, N.W.2d 759 (1995) (same); *Olson v. 3M Co.*, 188 Wis. 2d 25, 50, 523 N.W.2d 578 (Ct. App. 1994) (investigation requires exercise of judgment and discretion).

Finally, to the extent any state law claims are alleged directly against the City, they are also barred under Wis. Stat. § 893.80(4) which indicates "no suit may be brought against any … political corporation … for the intentional torts of its officers, officials, agents or employees." *See Milligan v. Cichacki*, 110 Wis. 2d 741, 330 N.W.2d 247 (Ct. App. 1982) (malicious prosecution is intentional tort and cannot be alleged against municipality).

## CONCLUSION

For these reasons, Defendants respectfully ask the Court to grant their Motion for Summary Judgment and dismiss all claims as a matter of law.

Dated and signed at Milwaukee, Wisconsin this 14th day of October, 2025.

EVAN C. GOYKE
City Attorney

s/ Meghan McCabe
MEGHAN MCCABE
Assistant City Attorney
State Bar No. 1132740
MATTEO REGINATO
Assistant City Attorney
State Bar No: 1089724

*Attorneys for Defendants*

**P.O. ADDRESS:**
200 East Wells Street
City Hall 800
Milwaukee, WI 53202
414-286-2601 –Telephone
414-286-8550 – Facsimile
Email:  mmccab@milwaukee.gov
          MReginato@milwaukee.gov

32