UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SANTOS SANCHEZ,

Plaintiff,

Case No. 24-cv-0306-bhl

v.

CITY OF MILWAUKEE WISCONSIN, MOISES GOMEZ,
GEORGE IRIZARRY, STEVEN SPINGOLA,
KENNETH GRAMS and JOHN VITRANO,

Defendants.

---

## ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

---

On October 18, 1996, a jury convicted Plaintiff Santos Sanchez of murdering Carlos Santiago. Nearly twenty-five years later, with assistance from the Wisconsin Innocence Project, Sanchez reached a stipulation with the Milwaukee County District Attorney's Office to vacate his conviction based on his trial counsel's ineffectiveness and newly discovered evidence. The District Attorney's Office has declined to retry him. Through this lawsuit, Sanchez seeks to recover against four Milwaukee Police Detectives, Moises Gomez, George Irizarry, Steven Spingola, and Kenneth Grams, and a Milwaukee Police Identification Technician, John Vitrano, for violating his due process rights in connection with his now-vacated conviction. Sanchez claims these individual defendants violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose exculpatory evidence, including the results of a comparison of his fingerprints with a latent fingerprint found on the murder weapon and a police report documenting an anonymous tip that another person had committed the murder. He also claims that Det. Gomez and Det. Irizarry fabricated evidence by tricking him into signing a false witness statement, which the prosecution then introduced against him at trial. Sanchez also seeks to hold the City of Milwaukee liable for the individual defendants' failure to disclose the fingerprint results under

*Monell v. New York Department of Social Services*, 436 U.S. 658 (1978), and a state law indemnification theory.[1]

The parties have filed cross motions for summary judgment. Defendants seek summary judgment on all claims, while Sanchez seeks judgment in his favor on his *Brady* claim and *Monell* claim relating to the fingerprint evidence. (ECF Nos. 48 & 53.) Based on the summary judgment record, the Court will grant Defendants' motion in part and deny Sanchez's motion in its entirety. The undisputed facts defeat Sanchez's *Brady* claims because they establish that the defendants did not "suppress" the challenged evidence under *Brady* and related caselaw. Sanchez's fabrication-of-evidence claim, however, remains subject to factual disputes that cannot be resolved at summary judgment and will be set for trial.

## BACKGROUND

### A. The Murder Investigation

Carlos Santiago was shot and killed in the early morning hours of April 18, 1996. (ECF No. 68 ¶19.) The shooting occurred at the home of Sanchez's ex-wife, Christina DePena, at 1831 W. Washington Street in Milwaukee. (*Id.* ¶19; ECF No. 63 ¶8.) Police were alerted to the crime when DePena called 911 from a payphone and reported that several men had attempted to rob her while she was at her apartment with her three daughters. (ECF No. 63 ¶¶8–9.) She also indicated that someone had been shot or stabbed. (*Id.* ¶9.) MPD Officers responded soon after and spoke to DePena. (*Id.* ¶10.) At that time, she told them that she had been returning to her apartment with her three daughters when she saw an unknown man being chased by two other unknown men. (*Id.* ¶11.) She further stated that when she opened her apartment door, the man being chased and one of his pursuers entered the apartment, that she also entered the apartment and went into a bedroom with her daughters, and then heard a gunshot. (*Id.*) Detectives Grams, Gomez, Irizzary, Spingola, and ID Tech Vitrano participated in the investigation that followed.

#### 1. The Fingerprint Evidence

Det. Grams arrived at the murder scene around 2:20 a.m., shortly after the 911 call, and found a 9mm handgun on the living room floor. (ECF No. 68 ¶¶20–21.) He collected the weapon, along with its magazine, a spent shell casing, and several unfired casings. (ECF No. 63 ¶¶22–25.) Later that morning, around 8:00 a.m., he provided this evidence to ID Tech Vitrano, who

[1] The complaint includes other claims, but Sanchez confirms that he no longer wishes to pursue them, (ECF No. 64 at 34), and they are therefore deemed abandoned and will be dismissed.

successfully recovered a latent fingerprint from the handgun's magazine. (*Id.* ¶¶25–26; ECF No. 68 ¶23.) ID Tech Vitrano documented the recovery in a written report, which indicated that the latent fingerprint had been assigned to Latent Case File #96-01011-01. (ECF No. 63 ¶27.) Det. Grams also prepared a report describing his initial investigation and the evidence recovered from DePena's apartment. Det. Grams' report documents the existence of the latent fingerprint and indicates that the print was assigned to "Latent Case #96-01011" and that ID Tech Vitrano's identification was pending. (*Id.* ¶28; ECF No. 59-4 at 81.) Both reports were included in a "Murder File" that investigators prepared and provided to the District Attorney's office in connection with Sanchez's subsequent prosecution. (ECF No. 63 ¶29.)

Later on April 18, officers took Sanchez into custody as a potential suspect and ID Tech Vitrano fingerprinted him. (ECF No. 68 ¶25.) ID Tech Vitrano compared Sanchez's fingerprints with the latent fingerprint obtained from the handgun's magazine and concluded the fingerprints did *not* match. (*Id.* ¶¶26–27.) ID Tech Vitrano and another technician also compared the latent fingerprint with fingerprints taken from DePena and the murder victim and concluded that their fingerprints also did not match the latent fingerprint from the magazine. ID Tech Vitrano documented these conclusions in Latent Case File #96-01011-01 by writing "No ID-SANCHEZ, 18 APR 96" and his initials next to Sanchez's name and by writing "No ID 18 APR 96" next to Santiago's name on the "Complainant's name" line of the file envelope. (ECF No. 63 ¶30; ECF No. 51-1 at 2.)[2]

The notations showing the conclusions of the fingerprint analysis were documented only in Latent Case File #96-01011-01. (ECF No. 63 ¶¶27–28.) None of the investigators created a supplemental report or otherwise separately noted the results in the Murder File. The Murder File did, however, include the reports from ID Tech Vitrano and Det. Grams. (*Id.* ¶29.)

**2. Sanchez's Witness Statement and Other Witness Interviews.**

After Sanchez was taken into custody, Det. Gomez interviewed him concerning the murder. Although the parties dispute the exact timing, they agree that police officers read Sanchez his *Miranda* rights after which he agreed to be interviewed and then provided his version of the events at DePena's apartment. (ECF No. 63 ¶33.) Because Sanchez did not speak English, Det. Gomez,

[2] Another notation next to Sanchez's name, indicating "No Prints 18 APR 96," was crossed out and marked with Vitrano's initials. (*Id.*) The technician who compared DePena's fingerprints similarly wrote "No ID 4 18 96" next to her name on the file envelope. (*Id.*)

who was bilingual, conducted the interview in Spanish. (*Id.* ¶32.) Det. Irizarry was also present for portions of the interrogation. (*Id.* ¶34.) After the interview, Det. Gomez prepared a written statement in English summarizing the substance of the discussion. (*Id.* ¶36.) Detective Gomez then read the statement back to Sanchez in Spanish and Sanchez signed it. (*Id.* ¶¶37–39.) The circumstances of the translation and the contents of what Det. Gomez read to Sanchez are disputed.

Det. Gomez contends he read Sanchez the witness statement exactly as it was written, except in Spanish, and thus accurately repeated back to him the narrative of events that he had just provided. (*Id.* ¶37.) According to Det. Gomez, and as described in the written statement, Sanchez explained in the interview that he and Santiago had been attempting to sell cocaine to two of Santiago's friends, when the would-be purchasers robbed them. (ECF No. 65-5 at 2.) Later, one of the drug suppliers, a Hispanic man, arrived at Santiago's house and stated that he wanted $6,000 for the lost cocaine, so the two men left and drove around trying to find the thieves. (*Id.*) The suppliers, the (unidentified) Hispanic man and another (also unidentified) Hispanic woman, were also searching for the robbers. (*Id.*) Ultimately, neither group of searchers was successful, and all four arrived at DePena's apartment, where the Hispanic man became angry, threatened and hit both Sanchez and Santiago, and then fatally shot Santiago. (*Id.* at 2–3.) As documented in the written statement, Sanchez claimed he did not know the shooter or woman, and could not provide any description other than that they were Hispanic. (*Id.* at 3.)

Sanchez offers a different account of what happened. He claims that when interviewed in Spanish he told Det. Gomez a more complete story that identified his cocaine suppliers and Santiago's murderer. According to Sanchez, he reported that Santiago had called him on the night of April 17, 1996 to ask for help selling cocaine. (ECF No. 68 ¶¶1–2.) He then reached out to DePena, because she had contacts who could supply cocaine and, after she agreed to help, he drove to her house. (*Id.* ¶¶3–5.) Sanchez was then taken by DePena and a man, known to him as "Muni," to Santiago's house to meet the two buyers, who eventually stole the cocaine after a struggle in which two shots were fired. (*Id.* ¶¶6–9.) He and Santiago then set out in Santiago's car to look for the buyers, did not find them, and returned to DePena's house. (*Id.* ¶¶10–11.) He identified the other suppliers as "Pacha" and "Blanquita," associates of DePena's, and confirmed that Blanquita was present at DePena's apartment after the failed drug deal, but then left and returned with Pacha, her brother. (*Id.* ¶¶12–13.) When Pacha arrived, Sanchez and Santiago were sitting on a sofa together. (*Id.* ¶¶14–15.) Pacha asked them where the drugs were, slapped Sanchez in

the face, hit Santiago in the face with a gun, and then shot Santiago. (*Id.* ¶¶14–16.) Sanchez immediately ran from the apartment to his sister's home and told her and his brother-in-law that Pacha had killed Santiago. (*Id.* ¶¶17–18.) Sanchez insists that he provided this more complete story, which is consistent with his trial testimony, to Det. Gomez.

Det. Gomez also interviewed Sanchez's ex-wife, DePena, on April 18, 1996. (ECF No. 63 ¶40.) During her interview, she reported that Sanchez had called her late on the night before the shooting and told her that her brother had been involved in a car accident. (*Id.* ¶41.) Sanchez then picked her up and drove her to Santiago's home, where they revealed to her that two men had stolen cocaine from them. (*Id.*) Sanchez then drove her back to her apartment, only to return a short while later, after 1:00 a.m., with Santiago. (*Id.*) DePena reported that Santiago and Sanchez were arguing and Sanchez demanded that Santiago give him the cocaine. (*Id.*) She then saw Sanchez pull out a handgun, place it at Santiago's head, and shoot him. (*Id.*) As this was happening, people were outside her apartment pounding on the front door. (*Id.* ¶42.) Sanchez then ran out of the apartment, shouted "let's go," and proceeded westbound. (*Id.* ¶43.) She then woke up her children and told them Sanchez had shot Santiago "because of drugs" and "a rip off" as they walked past Santiago's body. (*Id.* ¶44.) She told Det. Gomez that she instructed her daughters to lie to police and tell an invented story about unknown men running into the apartment and shooting a man inside. (*Id.* ¶45.)

Milwaukee Police Department (MPD) officers also interviewed DePena's three children, who told varying stories about men being chased into their apartment, being ordered to sit on the sofa and cover their eyes, and then hearing a gunshot. (ECF No. 63 ¶¶13–21.) They all later admitted the story was invented, and that their mother had instructed them to lie, but confirmed she had also told them Sanchez had shot Santiago as they walked by his body. (*Id.* ¶¶13–21.)

### 3. The Anonymous Tip

On April 22, 1996, four days after the murder, Detective Spingola received an anonymous tip. A man who did not identify himself called and reported that the murderers were Pacha and Paulina Candelario (or Candelario-Decupy) and that they could be found in the 1600 block of South 11th Street in Milwaukee. (ECF No. 63 ¶¶49–50; ECF No. 68 ¶62.) The caller did not reveal how he had learned the information. (ECF No. 63 ¶51.)

Det. Spingola documented the tip on a lead sheet and, at the direction of a supervisor, tried to follow up on it. (ECF No. 68 ¶63.) He presumed Pacha was a street name and not the potential

suspect's real first name. (*Id.* ¶64.) He called the post office to determine if there were any addresses associated with the names provided, contacted an FBI agent to search for various combinations of the names in a wider database, and searched for various combinations of these names through several MPD databases. (ECF No. 63 ¶¶53–55.) Det. Spingola maintains these efforts did not yield any results.[3] (*Id.* ¶56.) Months later, on July 10, 1996, Det. Spingola prepared a report describing the anonymous tip. (*Id.* ¶59.) The report states that he could not locate any record of Pacha or Paulina Candelario and also did not locate any records using variations of those names. (ECF No. 68 ¶67.)

**B. The Criminal Proceedings Against Sanchez**

On April 19, 1996, the Milwaukee County District Attorney's Office formally charged Sanchez with Santiago's murder. Prior to the charges being filed, Milwaukee County Assistant District Attorney, Carol Kraft, spoke with both Det. Gomez and DePena. (ECF No. 63 ¶47.) Based in part on those discussions, ADA Kraft decided to charge Sanchez with first-degree murder. (*Id.* ¶48.) Sanchez made his initial appearance on April 23, 1996 and shortly thereafter waived his right to a preliminary hearing. (*Id.* ¶¶60–61.) At that time, ADA Kraft noted on the Circuit Court's record that she had submitted 92 pages of discovery materials to the defense. (ECF No. 68 ¶73.)

On the day Sanchez was charged, DePena entered the Milwaukee County Sheriff's witness protection program. (ECF No. 63 ¶63.) She later disappeared and stopped communicating with the prosecutor. On July 15, 1996, ADA Kraft asked the court to adjourn Sanchez's trial because DePena could not be found. (*Id.* ¶67.) The court granted the request and issued a writ of body attachment for DePena. (*Id.* ¶68.) During a September 30, 1996 hearing, ADA Kraft reported that Det. Gomez and a Milwaukee County Sheriff were traveling to New York City to attempt to retrieve DePena and one of her daughters to testify at trial. (*Id.* ¶69.) Det. Gomez successfully located DePena and she returned with him to Milwaukee. (*Id.* ¶70; ECF No. 60-14 at 2–3.) She was held in custody pending her testimony at trial. (ECF No. 60-14 at 3.) During an October 14, 1996 pretrial hearing, the court noted that DePena's children were not found. (*Id.* at 4.) ADA Kraft reported that DePena had told the authorities that she had sent them out of the country. (*Id.*

[3] Sanchez asserts that this is inaccurate, and alleges that a search of the same databases, using only the last name Candelario, would have yielded police records for a Fausto Ortiz Candelario, who had reported an address on the same block indicated by the anonymous caller. (ECF No. 63 ¶53.)

at 4–5.) The court denied Defense Counsel's request for an adjournment to attempt to secure their appearances, and the case proceeded to trial on October 16, 1996. (*Id.* at 17.)

DePena, Det. Gomez, and Sanchez all testified at the trial. DePena was called during the prosecution's case in chief and testified that she saw Sanchez and Santiago arguing before the shooting, and saw Sanchez rub the gun near Santiago's face. (ECF No. 60-15 at 52:2–8; 53:24–54:3.) But, contrary to her earlier interview, she denied actually seeing the shooting, claiming she had been in a different room when it occurred. (ECF No. 63 ¶84; ECF No. 68 ¶93; ECF No. 60-15 at 53:6–10.) She also denied being involved with drug trafficking. (ECF No. 60-15 at 68–70.)

Det. Gomez testified concerning his interview of Sanchez after his arrest. (ECF No. 60-16 at 53:7–17.) He explained that he had conducted the interview in Spanish, but wrote down Sanchez's statement in English, read the statement to him in English, and then translated it to Spanish. (*Id.* at 54:1–14.) ADA Kraft introduced Sanchez's written statement and Det. Gomez read it to the jury. (*Id.* at 55:9–56:9.) She stopped his reading to ask whether Sanchez had been able to more particularly identify the "Hispanic male" and "Hispanic female" and Det. Gomez testified that Sanchez had told him he could only describe them as Hispanic. (*Id.* at 56:3–19.) Det. Gomez testified repeatedly that Sanchez could not identify various people in his narrative, including the shooter. (*Id.* at 60:10–14.) He also stated that Sanchez told him the unidentified Hispanic people went to DePena's house but could not give any explanation for why they did so. (*Id.* at 58:19–59:12.)

Sanchez testified in his own defense that he and Santiago had been robbed while selling cocaine obtained through DePena's contacts. (ECF No. 68 ¶12.) Because their suppliers wanted to be repaid, he and Santiago had left to search for the buyers, but did not find them and returned to DePena's apartment. (*Id.* ¶¶10–11.) DePena and the suppliers were angry about the failed drug deal. (*Id.* ¶12.) Blanquita, one supplier, left DePena's home and returned with her brother, Pacha. (*Id.* ¶13.) When Pacha arrived, he asked where the drugs were, slapped Sanchez, hit Santiago in the face with his gun, and then shot him. (*Id.* ¶¶14–16.) Sanchez then stated he had run from DePena's house to his sister's home and told his sister and brother-in-law that Pacha had killed Santiago. (*Id.* ¶¶17–18.) Sanchez also testified that he had told Det. Gomez substantially the same narrative during his interrogation. (ECF No. 68 ¶43.)

Det. Gomez was recalled and reiterated that Sanchez had not identified the shooter or other individuals by name during his interrogation. (ECF No. 60-16 at 149:14–24.) Sanchez's written

statement was used at trial in the prosecution's case in chief and to impeach Sanchez after he testified. (ECF No. 68 ¶¶55–56.)

In her closing argument, ADA Kraft insisted that Sanchez had invented Pacha, emphasizing that he had never mentioned Pacha before testifying at trial. (*Id.* ¶¶87–89.) She also implied that Pacha did not actually exist. (*Id.* ¶89.) Defense counsel argued that while Sanchez may not have told Det. Gomez everything about the circumstances of the shooting at first, it was not unusual for a suspect to tell an incomplete story while being interrogated. (ECF No. 63 ¶97.)

Both sides' lawyers also referred to the latent fingerprint comparison during closing arguments. Sanchez's counsel argued that no evidence was introduced to identify the fingerprint on the murder weapon, and that the jury should therefore conclude that the fingerprint was not Sanchez's. (ECF No. 63 ¶96; ECF No. 60-17 at 37:11–38:12.) On rebuttal, Kraft implied the fingerprint evidence was not presented because the print was not good enough to compare. (ECF No. 60-17 at 60:2–15.) She also told the jury the recovered print was unconnected to any alternate suspects, like "Pacha." (*Id.*)

On October 18, 1996, after a five-day trial, the jury convicted Sanchez of first-degree murder. (ECF No. 60-18.) The Court later sentenced him to life imprisonment with parole eligibility after forty years. (ECF No. 63 ¶¶98, 101).

**4. The Vacatur of Sanchez's Conviction**

On February 12, 2021, the Milwaukee County District Attorney's office and Sanchez's counsel stipulated that he was entitled to a new trial and his conviction was vacated. (*Id.* ¶¶107–08; ECF No. 60-23.) The stipulation was based on newly discovered evidence that Pacha Candelario existed and could have committed the murder, and, alternatively, that Sanchez's trial counsel's performance was constitutionally deficient because he failed to investigate Pacha. (ECF No. 60-23 ¶¶6–7.) The District Attorney's office declined to retry his case. (ECF No. 63 ¶108.)

Neither party obtained the Milwaukee County District Attorney's version of the Murder File during discovery in this case. (*Id.* ¶1.) Indeed, the record the parties present concerning discovery is murky. Sanchez's trial counsel is apparently deceased, and his appellate counsel did not produce a copy of the Murder File, as he received it. (*Id.* ¶2.) Defendants have introduced the MPD's copy of the Murder File. (ECF No. 59; ECF Nos. 59-1–59-5.)) The parties dispute, however, whether Det. Spingola's report of the anonymous tip and his efforts to investigate it were included in the file or other discovery provided to defense counsel. (ECF No. 68 ¶¶69–72.)

Defendants have introduced two affidavits from ADA Kraft. (ECF Nos. 52 & 69.) In the first affidavit, ADA Kraft confirms under oath that Det. Spingola's report of the anonymous tip was in fact included in the copy of the Murder File she received. (ECF No. 52 ¶7.) In the second, she attests that she was aware of the latent fingerprint evidence and where results of any fingerprint comparisons would be found. (ECF No. 69 ¶¶4–6.)

**LEGAL STANDARD**

Summary judgment is appropriate if the record shows there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Upon such a showing, the burden shifts to the opposing party to "make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). This burden is not onerous, but the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

If the parties assert different characterizations of the facts, the Court must view the record in the light most favorable to the non-moving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The Court may not make credibility determinations or weigh the

evidence when ruling on a motion for summary judgment. *Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021). "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

## ANALYSIS

The parties have filed cross motions for summary judgment. Defendants assert they are entitled to summary judgment on all claims. Sanchez seeks entry of summary judgment in his favor on his *Brady* and *Monell* claims related to the fingerprint evidence. The Court will grant Defendants' motion with respect to the *Brady* and *Monell* claims but deny Defendants' motion with respect to Sanchez's fabrication-of-evidence claim. Sanchez's motion will also be denied.

### I. Defendants Are Entitled to Summary Judgment on Sanchez's *Brady* Claims.

In his complaint, Sanchez alleges that Defendants violated his due process rights under *Brady* by suppressing evidence consisting of: (1) exculpatory materials related to the fingerprints taken from the murder weapon, and (2) Det. Spingola's receipt of the anonymous tip accusing Pacha and Paulina Candelario of the murder. (ECF No. 1 ¶¶46–47, 76–77.)

Under *Brady*, the government violates a defendant's due process rights if it suppresses material, exculpatory evidence in a criminal case. 373 U.S. at 87. Evidence is suppressed if "(1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *United States v. Are*, 590 F.3d 499, 510 (7th Cir. 2009) (quoting *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002)). In the criminal context, the nondisclosure of exculpatory evidence violates *Brady* "irrespective of the good faith or bad faith of the prosecution," 383 U.S. at 87, and thus a conviction will "be vacated regardless of whether the violation was intentional, reckless, or negligent." *Moran v. Calumet City*, 54 F.4th 483, 492 (7th Cir. 2022) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). A criminal *Brady* violation, however, "does not necessarily equate to civil liability under §1983." *Id.*

To prevail on a civil *Brady* claim under Section 1983, a plaintiff must show (1) the nondisclosure of evidence favorable to him; (2) concealment or suppression of the evidence by the defendant police officer or employee; and (3) prejudice. *See Jones v. York*, 34 F.4th 550, 559 (7th

Cir. 2022); *Beaman v. Freesmeyer*, 776 F.3d 500, 506 (7th Cir. 2015). Evidence is suppressed in the civil *Brady* context only when the particular defendant acted intentionally or at least recklessly in failing to provide the evidence. *Moran*, 54 F.4th at 493; *Miranda v. Cnty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *Cairel v. Alderden*, 821 F.3d 823, 832 n.2 (7th Cir. 2016). Moreover, if the allegedly suppressed evidence was otherwise available to the defendant through the exercise of reasonable diligence by his counsel, then it was not suppressed within the meaning of *Brady. Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992). To show prejudice, a plaintiff must demonstrate that there is a reasonable probability that the outcome would have been different if the evidence had been disclosed. *Moran*, 54 F.4th at 492–93 (internal citations omitted).

Further complicating civil enforcement efforts, primary responsibility for disclosing exculpatory evidence falls on the prosecution, but prosecutors have absolute prosecutorial immunity from suit for actions taken to prosecute a criminal case.[4] *Id.* at 492; *Fields v. Wharrie*, 672 F.3d 505, 512–15 (7th Cir. 2012). Police officers and other employees are also subject to *Brady*, but they cannot be held civilly liable so long as they disclose exculpatory evidence to the prosecution, even if the prosecutor then fails to disclose that evidence to the defense. *Moran*, 54 F.4th at 492 (citing *Beaman*, 776 F.3d at 512*)*. Police officers are also potentially protected by qualified immunity. *Id.*

**A. Defendants Are Entitled To Summary Judgment on Sanchez's *Brady* Claims Relating to the Fingerprint Evidence.**

Defendants offer several summary judgment arguments related to the fingerprint evidence, but the Court need not sift through them all. The record confirms that: (1) Det. Grams and ID Tech Vitrano both prepared reports documenting that a latent fingerprint was recovered from the handgun (ECF No. 68 ¶27; ECF No. 63 ¶28); (2) ID Tech Vitrano's report specified that results of his later efforts to identify the fingerprint would be in Latent Case File #96-01011-01 (ECF No. 68 ¶27; ECF No. 59-4 at 81.); (3) Det. Grams's report also noted that ID Tech Vitrano would attempt to identify the print, and the results would be in "Latent File #96-01011" (ECF No. 59-4 at 81); and (4) the reports were included in the Murder File provided to the prosecutor. (ECF No. 63 ¶29.) The prosecutor, ADA Kraft, has provided sworn testimony that she reviewed both

[4] When prosecutors act not as prosecutors, but as investigators, before an indictment is filed or a suspect is charged, they are not entitled to absolute immunity. *Whitlock v. Brueggeman*, 682 F.3d 567, 580 (7th Cir. 2012).

reports, (ECF No. 52 ¶¶10–11), and knew how to request later comparison results, (ECF No. 69 ¶¶4–6). Even taken in the light most favorable to Sanchez, these facts establish that ID Tech Vitrano and Det. Grams notified the prosecutor that the latent fingerprint existed and where to find the results of later comparisons. *See Moran*, 54 F.4th at 492–93. This disclosure means they cannot be held civilly liable for violating *Brady* and are entitled to summary judgment.

Moreover, the evidence establishes that Sanchez's trial counsel could have discovered the results of the fingerprint analysis with the exercise of reasonable effort. As stated above, evidence is not suppressed when the defendant could obtain it through reasonable diligence. *Are*, 590 F.3d at 510. When a disclosed or available document points to the existence of other exculpatory evidence, defense counsel is expected to exercise reasonable diligence to obtain it. *See, e.g.*, *United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014) (evidence was not suppressed when the criminal defendant failed to request it despite knowing it existed and where it could be located); *United States v. Kimoto*, 588 F.3d 464, 491–92 (7th Cir. 2009) (emails referenced in a deposition were not suppressed because the deposition was available through the exercise of reasonable diligence and would have alerted the defendant to the emails). Accordingly, test results are not suppressed within the meaning of *Brady* if the defendant had notice that the test occurred but then failed to request the results. *See, e.g.*, *Weaver v. Palakovich*, No. 10–3888, 2013 WL 504830, at *6 (E.D. Penn. Feb. 12, 2013) (habeas petitioner's *Brady* claim based on an alleged failure to disclose evidence from a rape kit failed because he knew the rape kit existed based on police reports that listed it but never requested results); *Turner v. Indiana*, 684 N.E.2d 564, 568 (Ind. Ct. App. 1997) (results of blood alcohol test were not suppressed because disclosed police reports documented that the test occurred, and the defendant never requested the results) (citing *United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996) *cert. denied*, 519 U.S. 868 (1996)).

The record establishes that ID Tech Vitrano and Det. Grams created two reports documenting that fingerprints had been recovered from the murder weapon and where later comparison results would be found, and both reports were provided to the prosecutor. (ECF No. 68 ¶27; ECF No. 59-4 at 81; ECF No. 63 ¶¶28–29.) These records confirm that Sanchez's counsel should have known of the latent fingerprint and was therefore responsible for exercising reasonable diligence to find out the comparison results. Beyond counsel, Sanchez himself must have known that his fingerprints were taken while he was in custody. (ECF No. 68 ¶25.) Despite the evidence that ID Tech Vitrano and Det. Grams created reports that were turned over to the prosecutor, thus

satisfying their *Brady* duties, Sanchez has not introduced any evidence regarding what information his counsel did or did not receive, or what efforts his counsel took to follow up on the fingerprint comparison referenced in the reports to support his argument that the information was *not* readily discoverable. Accordingly, on this record, neither ID Tech Vitrano nor Det. Grams can be held liable for violating Sanchez's rights under *Brady,* because the fingerprint comparison results were not suppressed.

In response and in support of his own summary judgment motion, Sanchez argues that Det. Grams and ID Tech Vitrano were required to do more, and further provide the results of the comparison to ADA Kraft and the defense. (ECF No. 64 at 14–15.) He insists that *Brady* required them to create supplemental reports after the comparison was completed and then provide those additional reports to the prosecutor for disclosure to the defense or otherwise inform the prosecution of the results of the comparison. (*Id.* at 9, 14–15). According to Sanchez, without these additional reports or other additional communication, his defense counsel could not have discovered the results and thus Det. Grams and ID Tech Vitrano did not satisfy their obligations sufficient to avoid any civil liability under *Brady*. (*Id.* at 13–14.) This overstates the Brady obligations on police officers and investigators, like Det. Grams and ID Tech Vitrano.

Sanchez primarily relies upon *Boss v. Pierce*, 263 F.3d 734, 741 (7th Cir. 2001), a habeas case in which the Seventh Circuit concluded that an exculpatory secondhand witness statement *was* suppressed within the meaning of *Brady*. But the statement at issue in *Boss* was much different. *Boss* involved a statement made by the prosecution's chief witness, who bragged about committing the crime to a third party, only to have the statement relayed to a defense witness, who later shared the secondhand information with police. *Id.* at 737–38. The prosecution did not disclose the report of the statement until the last day of defendants' trial, and, to make matters worse, the trial judge denied defense counsel's motion for a continuance to allow time to locate the third party. *Id.* at 738. Based on the circumstances, as the Court of Appeals explained, the exculpatory statement could not have been discoverable by defense counsel through the exercise of reasonable diligence. *Id.* at 742–43. The Court of Appeals highlighted the nature of evidence at issue, noting that the typical question when assessing whether defense counsel was reasonably diligent is whether defense counsel had access to the document containing the *Brady* material, such as reports available through an open file policy, rather than exculpatory information that defense counsel had no reason to know even existed. *Id.* at 741 (citing *United States v. White*, 970

F.2d 328, 337 (7th Cir. 1992)). Unlike the statement in *Boss,* ID Tech Vitrano's and Det. Grams's reports made it clear where the evidence could be found, and Sanchez has presented no evidence that his trial counsel made any effort to discover the results of the fingerprint comparison.

Sanchez also argues that a Wisconsin Statute, Wis. Stat. §971.23(1)(h) required the prosecution to disclose any exculpatory evidence, and that, because ID Tech Vitrano was listed on the state's witness list, he was statutorily required to disclose any opinions through a report, statement, or written summary under Wis. Stat. §971.23(1)(e). (ECF No. 64 at 17.) But Wisconsin criminal law does not determine the breadth of the constitutional guarantees provided by the due process clause. *See Wells v. Caudill*, 967 F.3d 598, 602 (7th Cir. 2020) ("[A]n error of state law is not properly rectified by deeming that error a constitutional tort."); *Wedgewood Ltd. P'ship I v. Township of Liberty*, 610 F.3d 340, 354 (6th Cir. 2010) (violations of statutory law do not automatically translate into procedural due process violations). The question of whether the information was unconstitutionally suppressed under *Brady* is different than whether the prosecution fulfilled the requirements of a state statute, or if ID Tech Vitrano prepared a sufficient expert report. Moreover, Section 971.23 states that a district attorney must provide this information "[u]pon demand" by the defense and clearly imagines defense counsel will still ask for relevant documents. Wis. Stat. §971.23(1).

Sanchez clarified in his briefing that his *Monell* claim is now based only on the MPD's policy of reporting latent fingerprint comparison results in separate latent fingerprint files, rather than creating supplemental reports to include directly in case files. (ECF No. 64 at 20.) Defendants therefore argue this *Monell* claim also fails because Sanchez cannot show an underlying constitutional violation. (ECF No. 67 at 14.) They are correct. Without an underlying constitutional violation, Defendants are also entitled to summary judgment on the *Monell* claim. *See Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014).

### B. Defendants Are Entitled To Summary Judgment on Sanchez's *Brady* Claim Based on the Anonymous Tip.

As stated above, police officers are not liable under *Brady* when they disclose exculpatory evidence to the prosecutor. *Moran*, 54 F.4th at 492 (citing *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015)). Defendants argue they have introduced unrebutted evidence that ADA Kraft received Det. Spingola's report documenting the anonymous tip and are therefore entitled to summary judgment on this claim. (ECF No. 49 at 16–19; ECF No. 67 at 7.) Sanchez disputes that

ADA Kraft ever received the report and insists this disagreement precludes summary judgment. (ECF No. 64 at 22.) But Sanchez's disagreement with ADA Kraft's declaration does not create a dispute of material fact. Defendants have introduced affirmative evidence confirming the prosecution's receipt of the tip evidence, requiring Sanchez to offer evidence that contradicts her declaration. Because he has not carried this burden, Defendants are entitled to summary judgment on this claim too.

Defendants present ADA Kraft's first sworn affidavit, which confirms under oath that she received Spingola's report documenting the anonymous tip and his investigation of it before trial. (ECF No. 49 at 5; ECF No. 67 at 7; ECF No. 52 ¶7.) They contend that this establishes that the prosecutor received the report, precluding civil liability for Defendants. *Moran*, 54 F.4th at 492. Defendants also highlight circumstantial evidence confirming that the Murder File included the tip information. The pages of the Murder File are bates numbered. (ECF No. 49 at 3 n.1; ECF No. 67 at 7.) Det. Spingola's report is labelled with the Murder File number, 3189, and the notation Section 4, page numbers 68 and 69. (ECF No. 63-1; ECF No. 59-5 at 47–48.) The bates numbers on the page are in sequence with another supplemental report purportedly created on the same day, July 10, 1996. (*See* ECF No. 59-5 at 47–48 (Det. Spingola's report of the anonymous tip, dated July 10, 1996), 49–52 (a report dated July 10, 1996, describing a July 9, 1996 pretrial conference between Detective Charles Hargrove and ADA Kraft, labelled Section 4, page numbers 70 through 73).)

In response, Sanchez has not come forward with any evidence contradicting ADA Kraft's clear statement that she received Det. Spingola's report. If Sanchez questioned ADA Kraft at deposition concerning this matter, he has not cited that testimony or provided excerpts from the transcript suggesting that her affidavits are incorrect. He cites testimony from Det. Gomez's deposition transcript, (ECF No. 64 at 22), but that testimony, when read in full, does not support his position. In deposition, Det. Gomez initially testified that he was unaware of Spingola's report, was uncertain whether it was in the Murder File, and was reading it for the first time at his deposition. (*Id.*) In response to later questioning, however, he clarified that he had not actually read all the reports in the Murder File and was not the sole person providing updated copies of the Murder File to the prosecutor. (ECF No. 60-4 at 96, 98:25–100:8, 102:10–105:17.) Defendants are thus correct that Det. Gomez's testimony does not contradict ADA Kraft's representation that

she received the report. That he did not know about the report does not mean that the report was not in the Murder File or that ADA Kraft did not receive the report as she confirms in her affidavit.

Because Defendants have offered evidence that the prosecutor received the report, and Sanchez has not offered any evidence that actually contradicts that evidence, the Court will grant Defendants' motion for summary judgment on this claim.[5]

## II. Defendants Are Not Entitled to Summary Judgment on Sanchez's Due Process Fabrication-of-Evidence Claim.

Defendants also seek summary judgment on Sanchez's claim that Det. Gomez and Det. Irizary violated his Due Process rights by fabricating the contents of the English version of the witness statement they prepared and had him sign. According to Sanchez, Det. Gomez falsely documented his interview to state that he could not identify Pacha and Blanquita, when he did in fact identify them. He further claims the prosecution later used this false statement, introduced through Det. Gomez, to undermine his credibility at trial. Defendants offer a different version of what transpired. According to them, Det. Gomez accurately recorded Sanchez's statement and the prosecutor properly used it against him at trial. This claim cannot be resolved at summary judgment.

To survive summary judgment on a fabrication-of-evidence claim, Sanchez must present evidence that would allow a reasonable jury to conclude that (1) Det. Gomez deliberately falsified evidence in bad faith; (2) the evidence was used at Sanchez's criminal trial; (3) the evidence was material; and (4) Sanchez was damaged as a result. *See Zambrano v. City of Joliet*, 141 F.4th 828, 831 (7th Cir. 2025). Fabricated evidence is evidence that is invariably false and known to be untrue by the fabricator. *Id*. (citing *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014); *Fields*, 740 F.3d at 1110). While a defendant's state of mind is generally a factual issue not determined at summary judgment, if a plaintiff fails to present any evidence of bad faith then courts may determine that the plaintiff has not satisfied this element. *Id*. The third element requires that

[5] In his briefing, Sanchez raises a new *Brady* claim based on Defendants' failure to discover or disclose Fausto Ortiz Candelario's arrest records. (ECF No. 64 at 11–14, 23–25; ECF No. 63-4; ECF No. 63-5; ECF No. 63-6.) This claim was not pleaded and cannot be added now. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488–89 (7th Cir. 2023). Moreover, as Defendants note, the claim is based on records that have not been authenticated. *See* Fed. R. Civ. P. 56(e); Fed. R. Evid. 901. Finally, Sanchez has presented no evidence that Det. Spingola acted recklessly or intentionally when he did not discover these records and therefore cannot show that they were suppressed in the civil *Brady* context. *See Moran*, 54 F.4th at 493.

the evidence be material, meaning "there is a reasonable likelihood the evidence affected the judgment of the jury." *Patrick v. City of Chicago,* 974 F.3d 824, 835 (7th Cir. 2020).

Defendants argue that Sanchez has not introduced evidence sufficient to prove this claim, and even if he had, they are entitled to qualified immunity. The record does not support Defendant's summary judgment argument on this claim. Simply put, Sanchez has presented sufficient evidence that, if credited by a jury, would show a violation of his due process rights. Moreover, on Sanchez's version of the facts, Defendants would not be entitled to qualified immunity. For that reason, his fabrication of evidence claim must survive summary judgment.

### A. Sanchez's Admissible Evidence, if Credited by a Jury, Could Support a Due Process Violation.

The parties have introduced competing versions of the events surrounding Sanchez's interview and the signing of his witness statement. Sanchez points to his sworn testimony that he told Det. Gomez a more detailed account of Santiago's murder that identified Pacha as the shooter. (ECF No. 68 ¶¶1–18; ECF No. 60-16 at 131:19–132:21.) He also cites his testimony that whatever Det. Gomez read to him at the time of his interrogation was not what he wrote down in English in the witness statement that he later signed. (ECF No. 60-16 at 133:13–134:20.) For his part, Det. Gomez insists he accurately transcribed the interview and accurately relayed it to Sanchez, who confirmed its accuracy by signing the statement. (*Id.* at 55:6–56:20, 58:14–60:20.) The Court cannot resolve the truth of these competing versions of the facts at summary judgment. *Reinebold*, 18 F.4th at 927. If a jury were to find Sanchez's account more credible, it could find that Det. Gomez knowingly fabricated his written statement during his custodial interrogation, and that Det. Gomez wrote the statement in English, rather than Spanish, to facilitate the deception.

Defendants offer four main arguments in support of their entitlement to summary judgment. First, Defendants argue that Sanchez "waived the right to pursue any constitutional challenge" related to his written statement by stipulating, before his criminal trial in 1996, that his statement was made voluntarily. (*See* ECF No. 49 at 11–12 (citing *United States v. Millhouse*, Case No. 10–3464, 2013 WL 5467743 at *6 (E.D. Penn. Sep. 30, 2013); *Stolts v. United States*, No. 4:09-CV-1195, 2010 WL 1257681 (E.D. Mo. Mar. 25, 2010); *Griffin v. United States*, No. 1:20CV54SNLJ, 2020 WL 7770827 (E.D. Mo. Dec. 30, 2020)).) Defendants cite three district court habeas decisions in support of this contention. All three cases involved petitioners who challenged the voluntariness of their statements—not whether the statements were intentionally

fabricated—and had all waived their right to challenge the voluntariness of their statements in various ways. *Millhouse*, 2013 WL 5467743, at *6 (habeas petitioner could not challenge his custodial statement as involuntarily made because he was intoxicated, when he knowingly withdrew his suppression motion challenging the same statement before his criminal trial); *Stolts*, 2010 WL 1257681, at *3 (petitioner could not challenge his confession as coerced when he had moved to suppress his statement on the same grounds before trial, but then withdrew the motion); *Griffin*, 2020 WL 7770827, at *4–5 (habeas petitioner who pleaded guilty could not raise an ineffective assistance of counsel claim for his counsel's failure to file a motion to suppress evidence of a controlled drug-buy when he had also waived his right to file pretrial motions, and there was also no factual or legal basis to support the unfiled motion to suppress). They therefore address different issues and are not relevant to Sanchez's claim. Sanchez contests the accuracy of his written statement, not whether he voluntarily gave it. This is simply a different inquiry.

Second, Defendants argue Sanchez's claim fails because he knew the information he allegedly provided and had the opportunity to cross-examine Det. Gomez at trial. (ECF No. 49 at 13.) If this claim were about suppressed exculpatory evidence, Sanchez's knowledge would be dispositive, but it is not. Defendants cite *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), but Sanchez's theory here is different than the theory advanced by the plaintiff in that case. In *Gauger*, the Seventh Circuit rejected a plaintiff's claim that the defendant police officers had violated *Brady* by not giving truthful versions of his own statements to the prosecutors to be forwarded to his defense counsel. *Id.* at 360. Sanchez pleads his due process claim differently here. He does not claim that Det. Gomez violated *Brady* by failing to correct a false version of his statement. Rather, Sanchez claims that Det. Gomez intentionally misrepresented what he said during his interrogation and mislead him when translating the English written statement to obtain his signature. Based on this assertion, Sanchez argues that his written statement was a fabricated piece of evidence that was later improperly used against him at trial. This theory fits squarely within the Seventh Circuit's precedent that using knowingly fabricated evidence at trial is a violation of a criminal defendant's due process rights, and is cognizable as a due process claim. *See Zambrano,* 141 F.4th at 830–31 (citing *Patrick*, 974 F.3d at 834–35). This is the type of claim Sanchez asserts here.

Third, Defendants argue Sanchez has not introduced evidence that Det. Gomez acted in bad faith by omitting Pacha and Blanquita's names from his written statement. (ECF No. 49 at

15.) Defendants insist Det. Gomez made significant efforts to ensure Sanchez's statement was accurate, like translating the English written statement back into Spanish, and that this "supports the conclusion that any errors or omissions were inadvertent." (ECF No. 67 at 10.) If these assertions are true, they would refute any claim that Det. Gomez acted in bad faith. But the Court cannot determine the veracity of Det. Gomez's version of events at summary judgment. Based on the record, a reasonable jury could find that Det. Gomez intentionally omitted key information from Sanchez's statement and wrote in English to facilitate this deception. Alternatively, a reasonable jury could find that Det. Gomez took these steps earnestly and his omissions were inadvertent. The Court simply cannot decide between the two versions of events and weigh credibility at summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("[W]here the facts specifically averred by [the nonmovant] contradict facts specifically averred by the movant, the motion must be denied."); *see also Reinebold*, 18 F.4th at 927. This is a question for a jury.

Fourth, Defendants argue that the omitted information was immaterial. They maintain that the names allegedly omitted are immaterial because courts have held that information omitted from a "report/statement is not material if it was presented at trial and the jury returned a guilty verdict." (ECF No. 49 at 14.) They cite *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012) and *Benavides v. McGrath*, 131 Fed. App'x 595, 596 (9th Cir. 2005), but both cases are inapplicable. In *Mota*, the defendant's *Brady* claim failed on appeal because he had introduced the allegedly suppressed exculpatory evidence at trial. 685 F.3d at 648–49. Similarly, in *Benavides*, the Ninth Circuit affirmed the denial of a habeas petition raising a *Brady* claim that police officers had inaccurately translated witnesses' statements because the witnesses later testified at trial and corrected their statements. 131 Fed. App'x at 596 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). Again, as stated above, Sanchez's fabrication of evidence claim is not a suppression of exculpatory evidence claim under *Brady*. Moreover, Det. Gomez maintained that the allegedly fabricated statement was accurate at trial, unlike in *Mota* and *Benavides*, where witnesses introduced the "corrected" evidence. *Mota*, 685 F.3d at 649; *Benavides*, 131 Fed. App'x at 596. Defendants also argue that the alleged fabrications are immaterial because DePena testified at trial to her version of events. (ECF No. 49 at 14–15; ECF No. 67 at 9.) This argument fails because the outcome of the trial depended largely on which version of events was believed, DePena's or Sanchez's, and DePena's testimony was rife with credibility issues. To wit, (1) she initially lied

to the police and told a wholly fabricated story, (ECF No. 63 ¶45), (2) she entered the witness protection program but later absconded, (*id.* ¶¶63, 67), (3) she sent the only other known eyewitnesses, her children, out of the country, (ECF No. 60-14 at 4–5), (4) she did not respond to a subpoena and was held in custody to ensure she testified, (*id.* at 3), (5) she testified at trial that she had not actually seen the shooting, when she previously stated she had, (*compare* ECF No. 60-15 at 52:2–8; 53:24–54:3, *with* ECF No. 60-15 at 53:6–10), (6) and Sanchez's version of events implicated her in drug trafficking, while her version did not, (*compare* ECF No. 68 ¶3*, with* ECF No. 60-15 at 68–70). If Sanchez's allegedly inaccurate statement was not introduced against him, the jury may have perceived him as more credible and may have credited his version of events over DePena's. The existence of DePena's testimony does not render Sanchez's allegedly fabricated statement immaterial. For the reasons discussed above, Sanchez has introduced evidence that, if credited by a jury, would show a constitutional violation.

**B. Defendants are not Entitled to Qualified Immunity.**

Government officials enjoy qualified immunity from suits under Section 1983 unless their conduct violates clearly established law. *Zorn v. Linton*, 607 U.S. 568, 571 (2026) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). A right is clearly established when it is sufficiently clear such that every reasonable official would have understood that his actions violated the right and existing precedent places the constitutional question beyond debate. *Id.* (citing *Rivas-Villegas*, 595 U.S. at 5). To determine that a right is clearly established, courts generally must identify a case where an officer acting under similar circumstances was held to have violated the Constitution. *Id.* at 572 (citing *Escondido v. Emmons*, 586 U.S. 38, 43 (2019)). "The relevant precedent must define the right with a 'high degree of specificity' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (citing *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). Generally stated principles are not enough. *Id.* In considering whether precedent places a constitutional question beyond debate, courts in the Seventh Circuit consider controlling Supreme Court precedent, Seventh Circuit precedent, and in the absence of relevant controlling precedent, whether other relevant case law establishes such a clear trend that the court can confidently say "that the recognition of the right by a controlling precedent was merely a question of time." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)). In addition, the Supreme

Court has maintained that some conduct may be so obviously unconstitutional that any reasonable person would be on notice of its unconstitutionality. *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002).

The Seventh Circuit has held that "[i]t is well established that 'a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (citing *Whitlock v. Brueggeman*, 682 F.3d 567, 580 (7th Cir. 2012)). This rather obvious and fundamental point has been clear in the case law since well before 1996, when Sanchez was investigated and prosecuted. In *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988), the Seventh Circuit affirmed a jury verdict holding police detectives liable for their knowing fabrication of evidence used to support a charge and continue a prosecution against the plaintiff. In *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008), the events of which occurred in 1989, the Seventh Circuit noted that fabricating evidence undisputedly violates clearly established rights. If a jury credits Sanchez's version of events, and finds that Det. Gomez intentionally and falsely documented the contents of Sanchez's interview, he would have violated Sanchez's rights, and any reasonable officer would have known that.

## CONCLUSION

For the reasons discussed above, the Court will deny Sanchez's motion for partial summary judgment. The Court will grant in part, and deny in part, Defendants' motion for summary judgment. Defendant's motion for summary judgment is granted as to Sanchez's *Brady* claims but denied as to Sanchez's due process claim based on his allegedly fabricated written statement.

Accordingly,

**IT IS HEREBY ORDERED** that Sanchez's Motion for Partial Summary Judgement, ECF No. 53, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 48, is **GRANTED in part, and DENIED in part**. The Clerk is directed to dismiss Defendants Grams, Vitrano, and Spingola from this action. Counts 3, 4, 5, 6, 7, & 8, as described in Sanchez's complaint, are dismissed.

Dated at Milwaukee, Wisconsin, on September 23, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge